ALMA E. JOHNSON, GUARDIAN OF WALTER A. JOHNSON, APPELLANT, V. BOYD A. MAYFIELD ET AL., APPELLEES.

81 N. W. 2d 308

Filed March 1, 1957. No. 34080.

*Francis M. Casey,* for appellant.

*Moran & James,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

Walter A. Johnson, named herein as Johnson, was 87 years of age in November 1955. He owned and lived for many years on the northeast quarter of Section 33, Township 10 North, Range 13 East of the 6th P.M., in Cass County. The land had been homesteaded by his father. Johnson was a long-time resident of that part of Nebraska. In recent years he lived with Alma E. Johnson, his daughter, hereafter referred to as appellant, who was a nurse and lived in Detroit, Michigan. Johnson made trips on several occasions between Michigan and Nebraska by himself while he was living in Detroit. The last trip was in June 1955. He was unaccompanied, came to Nebraska City, and made arrangements for his living accommodations there. Appellant was at that time and until after the sale and conveyance by Johnson of the land above described in Detroit, Michigan.

Johnson had expressed an intention and desire to sell his land 6 or 7 years before June of 1955. He then in-

terviewed Robert L. McKissick, an auctioneer, real estate broker, and owner of several farms in Otoe County whose residence and place of business were in Nebraska City. Johnson asked McKissick to sell the land and stated the price he required for it. McKissick went to the land, examined it, and reported to Johnson later that he could not sell it because the amount asked by Johnson was more than the land would sell for at that time.

Johnson made an effort to see McKissick on July 5, 1955, in Nebraska City but was not successful because McKissick was not there that day. Johnson left a message for McKissick and he met Johnson as requested the following day. Johnson told McKissick that he came to Nebraska City a month previous to sell the farm, that he had advertised it for sale and had not been successful, and that his failure to sell the farm was the reason why he came to see McKissick. Johnson said he wanted his farm sold at auction and that he desired Mark Fullriede of the Farmers Bank, who handled some of his business, to clerk the sale. He was told by McKissick that there would have to be a written contract authorizing an auction, that he was also a customer of the Farmers Bank, and that a contract could be prepared and completed there. They went to the bank and a contract was written and executed authorizing an auction sale of the land Saturday, July 23, 1955. Johnson selected the date. He wanted the sale on a Saturday. He arranged, while they were at the bank and while McKissick waited for him, to transfer his checking deposit account from a bank in Detroit to the Farmers Bank in Nebraska City. While at the bank he and McKissick arranged a trip to Plattsmouth the following week to secure publication of advertisements of the sale of the land and a visit to and examination of the' farm as to its then condition. They made the trip as planned. Johnson told McKissick while at the farm that it was difficult to properly handle the farm while a long distance from it and that was one reason why he wanted to

sell it. He also said that he could no longer take care of it, that he was not able to drive an automobile, that he thought the thing for him to do was to get rid of it, and that as soon as the farm was sold he thought he would move to Lincoln.

Johnson arranged to have advertisements of the sale published at Plattsmouth and he paid the cost thereof in cash. The date of the sale was changed by Johnson to July 30, 1955, because he thought it better to have more time for publicity of the time and place of the sale. This required another contract in writing authorizing the sale by auction and it was made and executed by Johnson at the Farmers Bank July 25, 1955. Johnson also advertised the sale in the Nebraska City paper.

The auction sale of the land was held July 30, 1955, as stated in the notices of it. There was wide publicity given it. There were 20 or 30 people who attended it —more than normally attend such a sale. The sale was open for bids for about 1 hour. The opening bid was $20,000 and bidding continued until $26,000 was reached. McKissick then called a recess and he, Johnson, and Fullriede, who was clerking the sale, went to the house on the land and conferred. The auctioneer told Johnson who the highest bidder was, the amount he had bid, and his belief that the bidder would not offer a higher amount for the land. Fullriede told Johnson that he thought $26,000 was a fair price for the land. Johnson said he wanted $27,000. The auctioneer made further effort to get a larger offer without success. Johnson directed him to sell it. This direction was made out of the hearing of others. The auctioneer then took Johnson with him and he made another effort for several minutes to obtain a higher bid but he failed. He then asked Johnson what his decision was and he said again, "Sell it" and McKissick did. The bid was $26,000 and the bidder was Boyd A. Mayfield.

A contract of purchase and sale was prepared the day of the auction. It was executed by Johnson and Boyd

A. Mayfield and the purchaser gave a check for $5,200 of the purchase price. The check was endorsed by Johnson, credited to his account in the Farmers Bank the day of the sale, and he at that time paid McKissick his compensation for conducting the sale. On August 1, 1955, the Monday following Saturday, the day of the sale, Johnson executed and acknowledged a deed for the land to the purchaser and his wife as joint tenants. It was complete except as to revenue stamps and was put in Johnson's safety deposit box in the bank ready for delivery when the balance of the purchase price was paid. This was agreed and intended to be March 1, 1956, but by negotiations between the parties completion and final settlement of the transaction was had on August 10, 1955. The deed was delivered to the grantees. A check for the balance of the purchase price was given Johnson and it was deposited to his account in the bank on August 10, 1955. Johnson invested the purchase price of the land in United States bonds secured for him at his request by the Farmers Bank. On the day of the final settlement Johnson went to the bank unaccompanied, got the deed from his safety box in the vault, took it with him from the bank, and later returned to the bank with the check for the net amount of the balance of the purchase price. He did this correctly and without assistance. The time of the final settlement of the transaction was accelerated because Johnson desired to secure interest during the interval to March 1, 1956, on the investment of the proceeds of the sale of the land he contemplated making. He accomplished this by conceding to the purchasers some unattached lumber, posts, and a metal culvert that were stored on the land. Johnson has voiced no objection to or expressed no dissatisfaction with the transaction, nor has he indicated any desire to have the land returned to him.

Appellant learned of the sale of the land of her father by a letter from her cousin, the tenant on the

land. She was a subscriber to and received the daily newspaper published in Nebraska City in which her father had published a notice that he desired to sell his farm, commencing with the issue of June 8, 1955, and continuing through June 28, 1955, and there was a notice published of the auction sale of the land in that paper commencing with the issue of July 8, 1955, through July 29, 1955. The total circulation of the paper was about 6,000. Appellant came to Plattsmouth soon after she learned of the fact of the sale of the land. She has since resided there. The time of her arrival in Nebraska is not disclosed by the record.

Appellant was appointed guardian of her father on September 23, 1955. She commenced this action October 7, 1955, to void the deed he gave to appellees to the land involved herein. The validity of the deed was challenged on the ground, as appellant alleged, that appellees procured its execution by falsely representing to the grantor that the land was not worth to exceed $26,000 when in fact the actual value of it was $45,000, that the grantor was not capable of knowing the value of the land, and that he was misled by the false representation of appellees as to its true value to his financial loss and damage. Boyd A. Mayfield, who attended the sale and was the successful bidder for the land, first met Johnson in 1946. He learned of the sale by a notice he saw in the Nebraska City paper. He had no conversation with Johnson concerning the land, its value, or at all until after the sale. He could not recall while testifying that he had ever had a conversation with Johnson on any subject before that time. The record does not show that he authorized anyone to discuss anything about the land on his behalf with Johnson or anyone representing him. The first time he met and said anything to Johnson concerning the land was after the sale when he, McKissick, Fullriede, and Boyd A. Mayfield went in the house on the land and the contract for the sale of the land was prepared and executed and the

purchaser wrote and delivered his check to Johnson for $5,200 of the purchase price of the land. There is no proof that either of the appellees made any representation to Johnson concerning the land or its value.

Appellant also alleged as a basis of the invalidity of the deed that Johnson was, when the land was sold and when he executed and delivered the deed, feeble and infirm in body and mind, was then 87 years of age, was not mentally competent to execute the deed, and was not mentally capable of understanding his actions or their effect.

The proof produced by appellant in this regard was, in substance, as follows:

Johnson in 1952 was paid $950 by check of the clerk of the district court for Cass County, Nebraska, the damages for right-of-way across his land for a power line. He repeatedly and continuously maintained he did not receive the check or the money due him on that account. The canceled check purportedly endorsed by him was produced by the clerk and Johnson denied the endorsement of the check was written by him. The check was traced to the bank and the deposit of it in the account of Johnson in the Farmers Bank of which he was a customer. Notwithstanding all this he steadfastly maintained that he did not receive or endorse the check for the money and funds it represented.

In the summer of 1953 Johnson had been in poor health and under the care of a doctor. He was on a street in Detroit, became dizzy, lost his balance, and fell. A doctor called found that Johnson was quite an ill man. The doctor diagnosed his illness as a light stroke. There was and has since been a change in his mental condition. He has since been quite forgetful and he has constantly proclaimed and maintained, for 5 or 6 years, that he has worms and lice. He thinks they are in the house and in the bedding. His conversation is not coordinated. He drifts from the present into the past. He attempts to discuss a subject, is not able to continue, but suddenly

passes to some other matter not connected with what originated the conversation. At times his conversation is incoherent. He has been under a doctor's care for 5 or 6 years and during that time he has been in the hospital at intervals. He was in the hospital near Christmas on account of arteriosclerosis and the fall before the trial he was in St. Joseph's Hospital in Omaha due to a circulatory condition. He had the attention of four or five Omaha doctors at that time.

Appellant has been a registered nurse engaged in the practice of her profession for more than 20 years, has had occasion to observe many psychiatric patients, and knows how to recognize a person of unsound mind. She expressed the opinion that her father was not mentally capable of transacting business and that he had been mentally disturbed for the last 4 or 5 years.

Appellant took her father to Omaha to consult Dr. Chester H. Farrell who was licensed to practice his profession in this state in 1932. He has and does practice in the field of neuropsychiatry. He had extensive instruction and training preparatory to the practice of his profession and has had large experience in the practice in the field in which he has specialized. Johnson was admitted to St. Joseph's Hospital October 10, 1955, and he remained there for 18 days. He was observed, examined, and studied during that time by Dr. Farrell and other specialists who were associated at his instance. Dr. Farrell found that Johnson had somatic delusions, one of which was that he had a skin disease caused by a parasite. It was established while he was at the hospital that he did not have such a disease. Another delusion he had was that he had a snake infesting the inside of his intestinal tract. He maintained he passed the snake at intervals. He described it in a characteristic way. He said it had red eyes that look at you and it had an octagonal design on its body. It was determined that he had no such infestation. Both of these beliefs of Johnson were definitely delusional. It

was found that Johnson had gross memory defect for both remote and recent events. The doctor, from his clinical impression and his psychological study, found that Johnson was definitely mentally ill and had been for a considerable duration, probably since sometime after the stroke he had 6 or 7 years before. It was the opinion of the doctor that Johnson was the same in July (1955) as he was in October (1955). He thought Johnson had been mentally ill for a long time. He explained that by mentally ill he meant that Johnson was not responsible, had an organic psychosis that had been brought on by age or physiological changes of the blood vessels, and that the psychosis was associated with advanced arteriosclerosis. In the opinion of the doctor Johnson did not on July 1, 1955, or on August 1, 1955, completely know the nature or extent of his property; that on July 30 and August 1, 1955, he was insane; that he had been insane for 5 or 6 years; and that his insanity was permanent. During his stay in the hospital he would become confused, get in the wrong room, and misidentify people. He would be garrulous one day and complaining the next. He complained of weakness and shortly thereafter would want to take a long, brisk walk. He got lost in the hospital. He was a kindly person, not troublesome, and an elderly man. All these things were taken into consideration by the examiner. The doctor said that Johnson had lucid intervals when he was not under stress and when everything was going along normally he could think clearly. The doctor was averse to attempting any opinion as to the duration of the lucid intervals but did suggest that they might be a matter of hours.

Johnson was at the home of the tenant of his land, who was also his nephew, about 2 weeks before the sale of the land. Johnson had Sunday dinner with his tenant and his family. The relationship and experience of the tenant and Johnson during the 4 years tenant had farmed his land had been pleasant and satisfactory.

Johnson and his nephew were friendly. Johnson said nothing to his tenant about a contemplated sale of the land though an auction sale of it was then being advertised or that Johnson desired or intended to terminate the tenancy of the tenant and cause him to surrender possession of the land. A couple days later Johnson had the sheriff of the county serve the tenant with a notice terminating tenancy of the tenant and demanding that he surrender possession of the land.

There was testimony of a witness of doubtful qualification who stated in his opinion the farm that was sold to appellees was, at the time of the sale, of the fair and reasonable value of $33,100.

The foregoing is the essence of the proof offered by appellant to support her claim that her father was of unsound mind and incapable of knowing or realizing what he was doing or the effect of what was done when he sold his farm to appellees.

It is significant that the tenant on the Johnson land was a witness produced by appellant and that he told of conversations he had with Johnson on the Sunday he was at the home of the tenant for dinner about 2 weeks before the sale of the land but the tenant was not asked what he had observed or learned about the condition of Johnson physically or mentally during the years he had known Johnson and during the 4 years that he was a tenant on the Johnson land. Likewise, there were 20 or more persons who attended the sale of the land. They had an opportunity to see and observe Johnson on the very day of the transaction involved. Johnson had lived on the land for almost a lifetime. An inference may be drawn from the record that he was well known in the surrounding area. Not one of these persons appeared at the trial to attest any disability or deficiency of Johnson either physical or mental.

Appellees produced the opinion of a thoroughly qualified real estate owner and dealer that the fair and reasonable value of the Johnson land at the time it was

sold was $24,000. The description of the land and improvements thereon contained in the record is not impressive. Johnson had charge of and conducted his affairs until after the sale of the land, at least until the daughter got herself appointed his guardian. There is not the slightest indication in the record of any improper or improvident act or transaction by Johnson. The purport of the evidence in this regard is convincing that he was a careful, prudent, and responsible individual. When he returned to Nebraska in June of 1955 he had a deposit account in the Farmers Bank of Nebraska City of more than $26,000. When he sold the land he invested the proceeds of the sale in United States bonds. The record is convincing that while Johnson was an old man and the eroding effect of time and age had to some extent taken its toll, he was not imprudent or incapable of knowing and understanding what he did.

The grantor was past 86 years of age at the time of the transaction involved herein. There is no presumption that a person of advanced years is incapable of transacting business. A litigant alleging that condition has the burden of establishing it. It is generally accepted that great age is an important factor to be considered with other evidence in appraising mental competency. It alone is not decisive. The law affirms the right of the aged to control and dispose of their property. There is an accumulation of proof that the ability to think, to deliberate, and to decide justly and prudently survives youth and middle age. It has often been considered that imbecility or weakness of mind does not void a deed and the fact that mental powers have been to some extent impaired by age or disease is not sufficient if the grantor has a comprehension of the meaning and effect of his act.

The burden of proof in an action to set aside a deed because of mental incapacity of the grantor is on the litigant who asserts it. It is said in Lund v. Woodward, 137 Neb. 689, 291 N. W. 90: "In a suit to set aside a

conveyance of real property for want of mental capacity on the part of the grantor, the burden of proof is upon the party alleging it to establish that the mind of the grantor was so weak or unbalanced when the conveyance was executed that he could not understand and comprehend the purport and effect of what he was doing." See, also, Eggert v. Schroeder, 158 Neb. 65, 62 N. W. 2d 266; Kiihne v. Charf, 149 Neb. 271, 30 N. W. 2d 914; Smith v. Black, 143 Neb. 244, 9 N. W. 2d 193.

The district court found that appellant failed to sustain the allegations of the petition and that the grantor was competent to transact business during the times important to this litigation. It rendered a judgment of dismissal of the case and denied the motion of appellant for a new trial.

This is an appeal in an equity case. The specifications of the procedure for the trial of an appeal in such a case in this court have been often stated. Keim v. Downing, 157 Neb. 481, 59 N. W. 2d 602; Hipsley v. Hipsley, 162 Neb. 518, 76 N. W. 2d 462. These have been observed in the consideration and decision of this appeal.

The record fails to establish either of the grounds alleged in the petition of appellant as a basis for the relief sought by her. The record fails to show that the mind of the grantor was so weak or unbalanced when the sale was had and the conveyance was made by him that he could not understand and comprehend the effect of what he did. The deed in issue was a valid conveyance of the land to appellees.

The judgment should be and it is affirmed.

AFFIRMED.